## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Adrian Ellis, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 20 C 5959 |
| v. | ) | |
| | ) | Hon. Jeffrey T. Gilbert |
| | ) | Magistrate Judge |
| Warden Santerelli, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Adrian Ellis, who was a pre-trial detainee at the Will County Jail (the "Jail") at the time he filed this lawsuit, brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983, alleging that he was subjected to unconstitutional living conditions. Specifically, Plaintiff alleged that since 2018, he was housed in various areas of the Jail where he was deprived of adequate sunlight, fresh air, and the opportunity to exercise.

Presently before the Court is Defendant Dale Santarelli's motion for summary judgment as a matter of law pursuant to Federal Rule of Civil Procedure 56. Plaintiff has responded to the motion, and Defendant has replied. For the reasons discussed below, Defendant's motion is granted. If Plaintiff wishes to appeal, he must file a notice of appeal on the docket in this case within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). If Plaintiff seeks leave to proceed *in forma pauperis* on

appeal, he must file a motion for leave to proceed *in forma pauperis* also in this case. *See* Fed. R. App. P. 24(a)(1). Final judgment shall enter. Civil case closed.[1]

## I.    Background

### A.    Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material facts exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). A fact is material if it might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 508 (7th Cir. 1992).

The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the party moving for summary judgment demonstrates the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts

---

[1] Following the initial screening of this case (*see* Dkt. 14), the parties consented to the jurisdiction of the magistrate judge and the case was reassigned to the undersigned for all further proceedings (*see* Dkts. 26, 28, 30, 31, 42, 43).

creating a genuine dispute." *Carrol v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-movant must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Hannemann v. Southern Door Cty Sch. Dist.*, 673 F.3d 746, 751 (7th Cir. 2012).

The Court's role is "to determine whether there is a genuine issue for trial," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citations and quotations marks omitted), without "weigh[ing] evidence, mak[ing] credibility determinations, resolv[ing] factual disputes and swearing contests, or decid[ing] which inferences to draw from the facts." *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). Thus, in making that determination, the Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

### B.    Northern District of Illinois Local Rule 56.1

Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this Court. The rule is intended "to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted.)

Local Rule 56.1(a) requires the moving party to provide "a statement of material facts" as to which the moving party contends there is no genuine issue for trial. LR 56.1(a); Fed. R. Civ. P. 56(1). The opposing party must then "file a response

to each numbered paragraph in the moving party's statement" of fact. *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005) (internal quotation marks omitted); LR 56.1(b), (e). In the case of any disagreement, the opposing party must reference "specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." LR 56.1(e)(3). "[M]ere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." *Id.* The nonmoving party may also present a separate statement of additional facts that require the denial of summary judgment that consists of "concise numbered paragraphs" "supported by citation to the specific evidentiary material, including the specific page number, that supports it." LR 56.1(b)(3), (d).

In this case, Defendant filed a LR 56.1 statement of material facts and memorandum of law with his motion for summary judgment. (Dkts. 68, 70.) Consistent with the Local Rules, Defendant also provided Plaintiff with a LR 56.2 Notice, which explains what LR 56.1 requires of a litigant opposing summary judgment. (Dkt. 71.)

For his part, Plaintiff submitted a "Brief in Opposition to Defendant's Summary Judgment Motion." (Dkt. 73.) The brief includes a short summary (in narrative form) of the "facts" of the case and eight pages of argument opposing

summary judgment.[2]  Plaintiff also submitted a "Statement of Disputed Factual Issues."  (Dkt. 75.)  Despite its caption, the one-page pleading includes just five generalized (and unsupported) statements about the nature of this lawsuit.[3]  In addition, Plaintiff submitted a "Declaration in Opposition to Defendant's Motion for Summary Judgment," which sets forth numbered paragraphs with various factual assertions. (Dkt. 74 at pgs. 2-4.)  Defendant assumed that Plaintiff's "Declaration" purported to function as his Local Rule 56.1(b)(3) statement of additional material facts (*see* Dkt. 79 at pgs. 1-2, ¶ 2), and he therefore filed separately a Local Rule 56.1(c)(2) statement in response. (Dkt. 76.)

Even generously construed, however, Plaintiff's submissions cannot be deemed an appropriate response to Defendant's statement of material facts. Although courts

---

[2] Plaintiff attaches a number of exhibits to his brief (*see* Dkt. 73 at pgs. 12-54).

[3] The document states, in its entirety, as follows:

> Defendant having moved for summary judgment on the plaintiff's claim concerning conditions of confinement. Pursuant to the Local Rules of this Court, the plaintiff submits the following list of genuine issues of material fact that require denial of defendant's motion.
>
> 1. Whether the conditions of confinement in plaintiff's complaint arise to an Eighth and Fourteenth constitutional violation.
>
> 2. Whether the plaintiff was subjected to the lack of outdoor access and exercise.
>
> 3. Whether the plaintiff was denied access to fresh air.
>
> 4. Whether the plaintiff was denied access to natural sunlight.
>
> 5. Whether the defendant, Warden Dale Santerelli, was personally involved in the Eighth and Fourteenth constitutional violations of the plaintiff.

(Dkt. 75.)

construe *pro se* pleadings liberally, *see Thomas v. Williams*, 822 F.3d 378, 385 (7th Cir. 2016), a plaintiff's *pro se* status does not excuse him from complying with federal and local procedural rules. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Collins v. Illinois*, 554 F.3d 693, 697 (7th Cir. 2009) ("[E]ven *pro se* litigants must follow procedural rules."). LR 56.1 "provides the only acceptable means of disputing the other party's facts and of presenting additional facts to the district court." *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995); *see also Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809-10 (7th Cir. 2005).

Under LR 56.1, Plaintiff was required to respond to each numbered statement of fact by admitting the fact, disputing it, or admitting it in part and disputing it in part. LR 56.1(e)(2). Plaintiff did not do so here; his factual responses do not clearly indicate whether he admits or disputes the facts in question. Moreover, in instances where Plaintiff appears to be disputing the facts in question, he has not properly cited to specific evidentiary material in accordance with LR 56.1(e)(3).

Therefore, the Court considers Plaintiff's responses to Defendant's statement of facts only to the extent they comply with the requirements of LR 56.1, are responsive and supported by the record or where Plaintiff could properly testify about the matters asserted. *See Sistrunk v. Khan*, 931 F. Supp. 2d 849, 854 (N.D. Ill. 2013). Where Defendant's statements are properly supported by the cited materials and are not otherwise disputed by Plaintiff's evidence, the Court considers those statements

as undisputed. Fed. R. Civ. P. 56(e)(2). The Court also construes Plaintiff's "Declaration" as his Local Rule 56.1(b)(3) statement of additional material facts and considers his statements of additional facts only to the extent they are supported by the record or in those instances where Plaintiff could properly testify about the matters asserted. *See Sistrunk*, 931 F. Supp. 2d at 854; *see also* Fed. R. Evid. 602.

With the guidelines above in mind, the Court turns to the facts of this case, stating those facts as favorably to Plaintiff as the record and LR 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012).

### C. Relevant Facts

Plaintiff was a pre-trial detainee at the Jail from February 2, 2018 until November 18, 2021. (Dkt. 68, Defendant's Statement of Facts, ¶ 1.) Defendant Santerelli is the Warden of the Jail and served in that position throughout the entire time Plaintiff was detained at the Jail. (*Id.* at ¶ 2.)

The Jail is a medium to maximum security detention facility located in Joliet, Illinois. (*Id.* at ¶ 3.) It is jail policy to comply with federal and state laws, including the Illinois County Jail Standards, established by the Illinois Department of Corrections, and the accreditation standards of the American Correctional Association (ACA) and National Commission for Correctional Healthcare (NCCHC), both of which have awarded accreditation status to the Jail. The ACA accreditation standards reflect good correctional practices, current case law, new knowledge, and the experience of jails across the country with their application. The Jail is inspected periodically by the Department of Corrections and is in compliance with the Illinois

County Jail Standards. The Jail is periodically inspected by the ACA auditors, and is in substantial compliance with the ACA accreditation standards. (*Id.* at ¶ 5.)

Rules governing detainees during their detention in the Jail, as well as information concerning the conditions of confinement, including rights and privileges, are set forth in the Inmate Handbook, with which Plaintiff was familiar. The rules listed in the Inmate Handbook are designed to maintain order, discipline, safety, and security in the jail. The Inmate Handbook is reviewed annually and revised or updated as necessary. (*Id.* at ¶ 6.)

With respect to the Jail's housing units (also referred to as "Pods"), all housing units or pods have a common dayroom surrounded by or facing cells. The older housing units, Pods A-F, each have 46 single occupancy cells. The newer housing units, including Pods G-L, each have 28 double occupancy cells. (*Id.* at ¶ 13.)

The cells in Pods A-F are approximately 88 square feet in size, with 68 square feet unencumbered space and have the capacity to house one inmate. The cells in Pods G-L are approximately 84 square feet in size with 52 square feet unencumbered space and have the capacity to house two inmates. The cells in the Medical Unit are approximately 76 square feet in size with 45 square feet unencumbered space and have the capacity to hold one inmate. All the cells in the Jail have a uniform ceiling height of 8 feet. (*Id.* at ¶ 14.) Each cell in Pods A-F has a concrete or metal bunk, desktop, shelf, and a prison-type uncovered toilet and sink combination with piped hot and cold water. Each cell in Pods G-L has two concrete or metal bunks, desktop,

8

a small metal stool attached to the floor, shelf, and an uncovered toilet and sink combination with piped hot and cold water. (*Id.* at ¶ 15.)

Each housing unit has a recreation area. Of the older housing units, consisting of A-F Pods, the A and B Pods have outdoor recreation areas, but no indoor recreation area. The C, D, E, and F Pods have both outdoor and indoor recreation areas. The newer housing units, consisting of the G-L Pods, have indoor recreation areas, but no outdoor recreation areas. (*Id.* at ¶ 16.) The indoor recreation areas in the Jail are about 30 feet by 40 feet in size, equipped with basketball hoops and basketballs. Detainees can also use the indoor recreation area to exercise. Detainees may use the indoor recreation space whenever they want on their scheduled time out of their cells, provided there are not more than 10 detainees in that area all at once. They may use the outdoor recreation area with the permission of the corrections officer, except after sunset and during inclement weather. (*Id.* at ¶ 17.)

During Plaintiff's detention in the Jail, use of the indoor recreation area was limited to 10 detainees at any given time, on a first-come/first-serve basis. (*Id.* at ¶ 18.) It is Jail policy to limit the number of detainees present in the inmate recreation areas at any one time for purposes of maintaining safety and security of the inmates and officers in the Jail, and also to prevent overcrowding so as to provide sufficient space for inmates to move around. (*Id.* at ¶ 19.) The Medical Unit has an exercise bike for detainees to use while housed there. The exercise bike is only accessible to one person at a time. (*Id.* at ¶ 20.)

Detainees may exercise in their cells while housed in any of the housing units, including the Medical Unit, except that detainees are not allowed to use any of the furniture or fixtures as part of their workout. (*Id.* at ¶ 21.) There is enough room in the cells in all housing units to lay on the ground, do push-ups, run in place, and stretch. (*Id.* at ¶ 22.)

The cells in Pods A-F have a window to the outside, but the dayrooms or common areas of those units do not have exterior windows. The cells in Pods G-L do not have a window, but there are large exterior windows in the dayrooms and indoor recreation areas, approximately 20 feet up the wall, which allow natural light to enter. (*Id.* at ¶ 23.) Screen shots from a body camera inside J Pod on August 2, 2019, show natural light entering through the dayroom windows. (*Id.* at ¶ 24.) Screen shots of video footage from the Jail's CCTV system of G Pod and K Pod on May 25, 2021, show natural light entering through the windows of the dayroom and indoor recreation areas. (*Id.* at ¶ 25.)

Timeouts are scheduled periods of time when detainees are allowed out of their cell and into the dayroom. It is Jail policy to maintain a schedule that allows detainees timeouts to participate in recreational activities and other programs, but also provides for an orderly and safe living and working environment. Per the Jail schedule, detainees are locked in their cells at night from about 10:30 pm to about 6:30 am. During the day, detainees in general population housing units are scheduled to be allowed outside their cells for about two and a half hours in the morning, about two and a half hours in the afternoon, and about three and a half

10

hours in the evening/night. The scheduled timeouts are curtailed in case of administrative lockdowns or other security needs. (*Id.* at ¶ 27.) Lockdowns are periods of time when detainees are confined to their cells with the door locked. Access to the dayroom is prohibited during lockdowns. Scheduled lockdowns occur throughout the day, after meals, and during the night. Administrative lockdowns can be unscheduled or spontaneous, because of unplanned incidents. Detainees can also be placed on lockdown as a penalty for violating Jail rules. Once lockdown is lifted, the corrections officer resumes the normal operations of the housing unit. (*Id.* at ¶ 28.)

It is Jail policy to provide a safe and sanitary living and working environment for detainees and staff, and the Jail has established procedures and rules to ensure that the cells, housing units, and other areas of the Jail are clean and in good repair. (*Id.* at ¶ 29.) Inmate housing unit workers are responsible for cleaning all the common areas within each housing unit, including the dayrooms and recreation areas (indoor and outdoor). Inmates are responsible for cleaning their individual cells. The custodial staff, under the building and grounds supervisor, provides cleaning supplies to each housing unit. (*Id.* at ¶ 30.) The custodial staff is responsible for the cleaning of the exterior windows located high in the dayroom and indoor recreation areas, and also clean up anything that constitutes a biohazard or health risk. (*Id.* at ¶ 31.)

It is Jail policy to inspect on a regular basis all aspects of the facility's operations and physical plant to ensure the integrity of the facility's security, safety,

and sanitation, and by doing so, guarantee a safe and secure environment for both staff and inmates. Jail sergeants are required to conduct a daily patrol of all areas occupied by detainees. Corrections officers are required to inspect their housing units and immediately address all housekeeping or maintenance problems. (*Id.* at ¶ 32.) When officers or sergeants observe that windows in the dayroom or recreation areas need cleaning, they are supposed to notify the custodial staff or building and grounds supervisor. In practice, this is usually done verbally. (*Id.* at ¶ 33.)

It is Jail policy to maintain a systematic plan for maintenance of all mechanical equipment in the facility. The maintenance supervisor, or craftsmen supervisor, is responsible for maintenance and repair activities in the Jail and supervises a team of maintenance workers skilled in plumbing, electrical, carpentry, engineering, locks, and electronics. Requests for routine maintenance or repair work are made by officers verbally or by generating a written work order. In practice, this is done verbally. The maintenance supervisor is required to review all requests or work orders and assign maintenance staff to complete the work. (*Id.* at ¶ 34.)

It is Jail policy to have a preventative maintenance program for all mechanical equipment including the heating, ventilation, and air-conditioning (HVAC) system in the Jail. The maintenance supervisor is responsible for implementing the preventative maintenance program through in-house personnel or outside vendors and regularly inspect all major mechanical equipment, including boilers, drives, chillers, colling tower, and HVAC system. (*Id.* at ¶ 35.)

Jail policy requires a proper ventilation system that provides at least 15 cubic feet of continuous air per minute of circulated air per occupant of a cell, with a minimum of 5 cubic feet of outside air in all inmate cells. (*Id.* at ¶ 36.) The Jail's HVAC system is an automated Variable Air Volume (VAV) system. Mechanical, or forced, ventilation is provided by an air handler and used to control indoor air quality. The air handler regulates and varies the amount of air flow of the system based on the temperature and humidity. The air goes through filters before entering the housing units un the Jail. Excess humidity, odors, and contaminants are controlled via dilution or replacement with outside air. Generally, the percentage of outside air forced through the air handlers is about 30-35%. (*Id.* at ¶ 37.) The VAV HVAC system in the Jail provides more than 15 cubic feet of continuous air per minute of circulated air in all of the cells in the inmate housing units of the Jail. The amount of outside air forced into the air handlers varies, but is at least 5 cubic feet. (*Id.* at ¶ 38.)

As part of routine maintenance, the maintenance crew inspects the Jail's HVAC system every 2-3 weeks and replaces any belts or air filters that are worn out or dirty. (*Id.* at ¶ 39.) Every three years, the Jail's ventilation system is inspected by technicians from Health Choice Enterprises, LLC, and outside agency, for compliance with the ACA Performance Standard 3-ALDF-2D-07, which requires ventilation systems to supply "at least 15 cubic feet per minute of circulated air per occupant with a minimum of 5 cubic feet per minute of outside air. The ACA standard also requires toilet rooms and cells with toilets to have no less than 4 air

exchanges per hour. (*Id.* at ¶ 40.) During the inspection, the technicians check all the exhaust fans that serve the inmate housing units, analyze the ventilation system in all inmate housing units, and conduct tests to measure the ventilation air supply in cubic feet per minute in a cell and ventilation air exchange rates in a cell per hour. (*Id.* at ¶ 41.) The air exchange rate is the number of times that the total air volume in a room or space is completely removed and replaced in an hour. (*Id.* at ¶ 42.)

The Jail's ventilation system was inspected and analyzed by independent technicians from the outside agency in August 2018 and June 2021. The technicians assessed and tested all the inmate housing units of the Jail to determine the total ventilation air supply in cubic feet per minute in a cell and total ventilation air exchange in a cell per hour. After conducting those tests, the technicians reported that the Jail's HVAC system met or exceeded the required criteria of the ACA standard. (*Id.* at ¶ 43.)

Between 2018 and 2021, maintenance workers at the Jail cleaned and repaired the vents and windows and performed other maintenance as needed in the inmate housing units, as and when they were notified by officers or supervisors. (*Id.* at ¶ 44.) It is Jail procedure for officers stationed in a Pod to record in a log, called the officer activity log, every time any staff or personnel, including maintenance staff, enter or exit the housing unit. The officer activity logs for the various Pods in the Jail should show when and for what reason the maintenance worker or custodial staff has entered a Pod. (*Id.* at ¶ 46.) However, in practice, the name and specific

reason for the maintenance worker's visit is not always noted by the officers. (*Id.* at ¶ 47.)

The officer activity logs show that on August 23, 2018 and June 14, 2021, maintenance workers cleaned the vents in J Pod. (*Id.* at ¶ 48.)  The officer activity logs show that on August 23, 2018 and August 15, 2019, maintenance workers cleaned the vents in L Pod. (*Id.* at ¶ 49.)  The officer activity logs show that on August 15, 2019, maintenance workers cleaned the vents in H Pod. (*Id.* at ¶ 50.)  The officer activity logs show that on April 11, 2019, maintenance workers cleaned the vents in G Pod. (*Id.* at ¶ 51.)  The officer activity logs show that on August 23, 2021, maintenance workers cleaned the ducts or vents in A, B, C, D, and E Pods. (*Id.* at ¶ 52.)  The officer activity logs show that on March 21, 2018, maintenance workers cleaned the windows in the Medical Pod. (*Id.* at ¶ 53.)  The officer activity logs show that on August 15, 2019, maintenance workers cleaned the windows in H Pod. (*Id.* at ¶ 54.)  In August 2021, maintenance workers cleaned the windows both inside and outside, in the dayrooms and recreation areas of G, H, I, J, K, L, and Medical Pods. (*Id.* at ¶ 55.)

During the first year of the Covid-19 pandemic, from about March to November 2020, the Jail was under Covid-19 protocols that resulted in extended periods of strict lockdowns. During this time, movement of staff, personnel, and inmates was severely restricted and limited to urgent or emergent situations. This affected the maintenance crew's ability to clean windows in the inmate housing units, although they did go in and clean up windows whenever they were notified of

any serious issues that would amount to a biohazard or other health hazard. (*Id.* at ¶ 56.)

Plaintiff was detained in the Jail for a total of 1,385 days. (*Id.* at ¶ 57.) During Plaintiff's detention at the Jail, he was housed in A, D, E, G, H, J, L Pods, and the Medical Unit at various times between his booking in February 2018 and his transfer out of the facility in November 2021. (*Id.* at ¶ 58.) At his deposition, Plaintiff testified that his complaint about lack of natural light and exercise pertains to the time he spent in J, G, L, H Pods and the Medical Unit (as the other Pods had access to outdoor recreation areas). (*Id.* at ¶ 59.) Plaintiff was detained in G, H, J, L Pods, or the Medical Unit for a total of 723 non-consecutive days. (*Id.* at ¶ 60.)

According to Plaintiff, the lack of exercise caused him back pain and exacerbated his diabetes. (*Id.* at ¶ 62.) Plaintiff claims that the lack of sunlight and poor ventilation caused him to have headaches, depression, lack of Vitamin D, and negatively impacted his vision and diabetes. (*Id.* at ¶ 63.) Plaintiff has suffered from Type 1 diabetes since 1994. Plaintiff takes daily insulin and maintains a restrictive diet as treatment for his diabetes. (*Id.* at ¶ 64.)

On June 25, 2018, while Plaintiff was exercising in the gym of J Pod, he was observed sitting on the floor where he complained of tightness in his back. Nurse Olivia Simpri evaluated Plaintiff and placed him on a 3-day gym restriction. Additionally, Nurse Simpri attempted to administer pain medication, but Plaintiff refused. Plaintiff recalls that he was exercising in the gym when he became hot, his blood sugar dropped low, and he passed out. (*Id.* at ¶ 65.) On September 16, 2019,

Nurse Simpri saw Plaintiff for a medical pass where Plaintiff presented with low blood sugar of 33 dl/ml. Plaintiff reported that he had been exercising. Nurse Simpri counseled Plaintiff on the importance of him exercising in moderation as a means of maintaining his blood sugar levels. (*Id.* at ¶ 66.)

On April 26, 2018, the lab results on Plaintiff's bloodwork indicate that his calcium level was 9.0 mg/dl, which fell within the "normal" range of 8.7-10.2 mg/dl. (*Id.* at ¶ 67.) On January 10, 2019, the lab results on Plaintiff's bloodwork indicate that his calcium level was 8.9 mg/dl. On April 18, 2019, the lab results indicate that his calcium level was 9.1 mg/dl. On February 21, 2020, the lab results indicate that his calcium level was 8.9 mg/dl. (*Id.* at ¶ 68.) On July 29, 2020, the lab results indicate that his calcium level was 8.6 mg/dl, just outside the normal range. On August 4, 2020, the lab results indicate that his calcium level was 8.5 mg/dl. (*Id.* at ¶ 69.) On July 22, 2021, the lab results indicate that his calcium level was 9.2 mg/dl, within the normal range. (*Id.* at ¶ 70.) On June 7, 2021, Plaintiff submitted a Healthcare Request to "see the doctor for symptoms pertaining to the lack of proper vitamins." (*Id.* at ¶ 71.) Between June 9, 2021 and November 18, 2021, Plaintiff received a daily multi-vitamin as part of his medications. (*Id.* at ¶ 72.)

## II.   Discussion

Because Plaintiff was a pretrial detainee at the time of the events alleged in the complaint, his claim of unconstitutional living conditions is assessed under the Fourteenth Amendment's Due Process Clause. *Hardeman v. Curran*, 933 F.3d 816, 821–22 (7th Cir. 2019). Pretrial detainees cannot be held in conditions that "'amount

to punishment.'" *Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 856 (7th Cir. 2017) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). A pretrial condition can amount to punishment in two ways: if it imposed for the purpose or punishment, or if it is not reasonably related to a legitimate goal, that is, if the condition is arbitrary or purposeless. *Mulvania*, 850 F.3d at 856 (citing *Bell*, 441 U.S. at 538–39).

A pretrial detainee establishes a claim for unconstitutional conditions of confinement by showing that: (1) he was subjected to conditions that "either alone or in combination, pose[d] an unreasonable risk of serious damage to his health;" (2) defendants "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though [defendants] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell v. Pineiro*, 849 F.3d 17, 30, 35 (2d Cir. 2017); *see Miranda v. Cty. of Lake*, 900 F.3d 335, 351–54 (7th Cir. 2018). It is not enough to show negligence or gross negligence. *Miranda*, 900 F.3d at 353–54.

Defendant here moves for summary judgment on the following grounds: (1) no reasonable jury could find the Jail's policies and conditions were objectively serious enough to amount to a constitutional violation; (2) there is no evidence that Warden Santerelli had any personal involvement in the conduct about which Plaintiff complains; (3) Plaintiff's transfer from the Jail (to prison) renders his claims for injunctive and declaratory relief moot; and (4) Plaintiff cannot prove any compensable damages. (Dkt. 70 at pg. 2.)

In this lawsuit, Plaintiff complains about a lack of outdoor access and exercise, fresh air, and sunlight. Plaintiff claims that the conditions negatively impacted his health. However, based on the record before this Court, no reasonable jury could find that Plaintiff can establish an unconstitutional living conditions claim.

## A. Outdoor Access and Exercise

With respect to outdoor access and exercise, the Seventh Circuit has recognized that a constitutional violation occurs "where movement is denied and muscles are allowed to atrophy and the health of the individual is threatened." *Smith v. Dart*, 803 F.3d 304, 313 (7th Cir. 2015) (citation omitted). However, "there is a significant difference between a lack of outdoor recreation and an inability to exercise." *Smith*, 803 F.3d at 313.

The evidence in the record shows that Plaintiff was detained in the Jail for a total of 1,385 days (from February 2018 until November 2021). (Dkt. 68 at ¶ 57.) During that time, he was housed in different pods or housing units: A, D, E, G, H, J, L Pods, and the Medical Unit. (*Id.* at ¶ 58.) Pod A has outdoor recreation areas, but no indoor recreation area. (*Id.* at ¶ 16.) Pods D and E have both outdoor and indoor recreation areas. (*Id.*) Pods G, H, J, and L have indoor recreation areas, but no outdoor recreation areas. (*Id.*) Plaintiff was detained in Pods G, H, J, L, or the Medical Unit (the pods with only indoor recreation areas) for a total of 723 days, *non-consecutively*. (*Id.* at ¶ 60.) With respect to Pods G, H, J, L, Plaintiff had access to a 30-foot by 40-foot area equipped with basketball hoops and basketballs. (*Id.* at ¶ 17.)

19

The evidence before the Court shows that detainees were generally allowed free time out of their cells for a few hours a day in all the housing units. (*Id.* at ¶¶ 17, 27.) Detainees were able to use their free time to access the indoor recreation areas and exercise. (*Id.*) The indoor recreation areas were available for all inmates in the housing units to access but were limited to only 10 inmates at a time on a first-come/first-serve basis. (*Id.* at ¶ 18.) That particular Jail policy was aimed at maintaining safety and security inmates and officers, and also to prevent overcrowding (so as to provide sufficient space for inmates to move around). (*Id.* at ¶ 19.) At his deposition, Plaintiff testified that even on the days when he was unable to access the indoor recreation areas due to the Jail's 10-person limitation policy, he was still able to exercise in his cell. (*Id.* at ¶¶ 21-22.)

The evidence shows further that when Plaintiff was housed in the Medical Unit, he had access to the recreation area there which contained an exercise bike (which only one person was able to use at a time). (*Id.* at ¶ 20.) At his deposition, Plaintiff testified that even on the days when he was unable to access the single exercise bike, he was still able to exercise in his cell (although, in some instances, exercising was difficult due to the smaller-sized cells and whether he had a cellmate). (*Id.* at ¶ 21-22; *see also* Dkt. 68-10 at 143:18-24; 144:1-11.)

In sum, the undisputed evidence before this Court shows that Plaintiff was allowed sufficient access to exercise either outdoors, indoors, or in his cell throughout the entire time he was detained at the Jail, and that he took advantage of that access. It is clear from Plaintiff's response to Defendant's motion for summary judgment and

his deposition testimony that he is dissatisfied with not being able to exercise in accordance with his personal preferences (when, where, how, and how often he would have liked) and that he laments, in particular, the cramped or smaller cell spaces in the Medical Unit. (*See* Dkt. 73 at pgs. 3-5.)  But Plaintiff has not pointed to anything that suggests the conditions about which he complains -- what he describes as a "lack" of outdoor recreation and exercise -- rise to the level of a constitutional problem. Notably, aside from Plaintiff's allegations in his complaint and his vague statements during his deposition, there is nothing in the record that suggests that Plaintiff's health was negatively impacted by any "lack" of outdoor access and exercise. To the contrary, the record reflects that any health consequences Plaintiff suffered in connection with exercise were those related to his physical *over-exertion*. Specifically, the record reflects two instances when Plaintiff over-exerted himself and, consequently, required and received prompt medical care/attention. (*See* Dkt. 68 at ¶¶ 64-65.)

### B. Access to Fresh Air

With respect to fresh air, inmates are constitutionally entitled to "reasonably adequate ventilation."  *Hardeman v. Curran*, 933 F.3d 816, 820 (7th Cir. 2019) (citation omitted). And, "'the Seventh Circuit has suggested that detainees have a constitutional right to sunshine and fresh air.'" *Passmore v. Josephson*, 376 F. Supp. 3d 874, 886 (N.D. Ill. 2019) (quoting *Jerricks v. Schomig*, 65 F. App'x 57, 58 (7th Cir. 2003) (unpublished opinion)). In this case, the record is replete with evidence showing that the Jail had a properly functioning and well-maintained ventilation system, and

that windows and vents were cleaned on numerous occasions throughout the time Plaintiff was detained at the Jail. Moreover, as discussed in the next section of this Memorandum Opinion and Order and incorporated here by this reference, there is no evidence before this Court that suggests that Plaintiff suffered any ill-effects on his health from what he describes as poor ventilation.[4]

Specifically, with respect to the ventilation conditions, the evidence shows that mechanical, or forced, ventilation is provided at the Jail by an air handler and used to control indoor air quality. (Dkt. 68 at ¶ 37.) The air handler regulates and varies the amount of air flow of the system based on the temperature and humidity. (*Id.*) The air goes through filters before entering the housing units in the Jail. (*Id.*) Excess humidity, odors and contaminants are controlled via dilution or replacement with outside air. (*Id.*) Generally, the percentage of outside air forced through the air handlers is about 30-35%. (*Id.*) The ventilation system in the Jail provides more than 15 cubic feet of continuous air per minute of circulated air in all the cells in the inmate housing units of the Jail. (*Id.* at ¶ 38.) The amount of outside air forced into the air handlers varies but is at least 5 cubic feet. (*Id.*)

Additionally, the evidence shows that as part of routine maintenance, the maintenance crew inspects the Jail's HVAC system every 2-3 weeks and replaces any belts or air filters that are worn out or dirty. (*Id.* at ¶ 39.) The maintenance crew also

---

[4] To the extent that Plaintiff is claiming he was denied fresh air and sunlight because he was not afforded sufficient outdoor access, that claim fails as a matter of law for the reasons discussed above in Section II.A. The Court therefore confines its analysis here to Plaintiff's contentions that he was denied fresh air because of poor ventilation and, below, to his contention that he was denied access to sunlight because of dirty windows.

cleans and repairs vents or any equipment on receiving notice from officers. (*Id.* at ¶ 44.) Every three years, the Jail's ventilation system is inspected by technicians from an outside agency for compliance with ACA Performance Standards. (*Id.* at ¶¶ 5, 40.) During the inspection, the technicians check all the housing units, and conduct tests to measure the ventilation air supply in cubic feet per minute in a cell and ventilation air exchange rates in a cell per hour. (*Id.* at ¶¶ 41-42.) With respect to the period of time that Plaintiff was detained at the Jail (from February 2018 to November 2021), the Jail's ventilation system was inspected and analyzed by independent technicians from an outside agency (Health Choice Enterprises, LLC) in August 2018 and June 2021. (*Id.* at ¶ 43.) The technicians assessed and tested all the inmate housing units of the Jail to determine the total ventilation air supply in cubic feet per minute in a cell and total ventilation air exchange in a cell per hour. (*Id.)* After conducting those tests, the technicians reported that the Jail's HVAC system met or exceeded the required criteria of the ACA standard. (*Id.* at ¶ 43.) Throughout Plaintiff's detention at the Jail, the maintenance team performed various cleanings of the vents in the J, L, H, and G Pods. (*Id.* at ¶¶ 45-52.)

### C. Access to Sunlight

With respect to the sunlight conditions claim, the undisputed evidence before this Court shows that the cells in Pods A-F have a window to the outside (while the dayrooms in those Pod do not have windows to the outside). (*Id.* at ¶ 23.) The cells in Pods G-L do not have a window to the outside, but the dayrooms and indoor recreation areas have large windows to the outdoors (which permit natural light to enter). (*Id.)*

The Jail's maintenance logs show that the maintenance units cleaned the windows in the housing units during Plaintiff's detention at the Jail (from February 2018 to November 2021). (*Id.* at ¶¶ 31, 44-47, 53-55.)  Photos of J Pod in August 2019 and G and K Pods in May 2021 show natural light entering through the exterior windows of the dayroom and indoor recreation areas. (*Id.* at ¶¶ 24-25.)

And, again, there is no evidence before this Court that suggests that Plaintiff suffered any ill-effects on his health from what he describes as poor ventilation and a lack of sunlight. Rather, the undisputed evidence in the record shows that between 2018 and 2021, the lab results on Plaintiff's bloodwork indicate that his calcium levels were between 8.5 to 9.2 mg/dl, which is within the normal calcium range. (*Id.* at ¶¶ 67-70.)  Plaintiff's calcium levels dipped just below the normal range only in July and August 2020. (*Id.* at ¶ 69.)  In June 2021, Plaintiff sought and received medical care, including the prescription of a daily multi-vitamin as part of his medications. (*Id.* at ¶ 71.)  Plaintiff received a daily multi-vitamin from June 9, 2021 through November 18, 2021. (*Id.* at ¶ 72.)  On July 22, 2021, just weeks after beginning his daily multi-vitamin prescription, Plaintiff's bloodwork indicated that his calcium levels were back to the normal range. (*Id.* at ¶ 70.)

It is clear from Plaintiff's allegations, his deposition testimony, and his response to the summary judgment motion that he would have preferred an overall cleaner environment at the Jail and more frequent or thorough vent and window washing. The Court understands and appreciates Plaintiff's dissatisfaction with the conditions of his confinement. The Court does not mean to diminish or belittle

Plaintiff's claims because it understands that incarceration for the length of time that Plaintiff resided at the Jail, under the conditions he describes, is far, far from pleasant. But, simply put, under the law as interpreted by the Supreme Court and the Seventh Circuit, not every inconvenience, uncomfortable, or less than ideal condition violates the constitution. *See Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988) (inmates are not entitled to the "amenities, conveniences, and services of a good hotel"); *see also Shelby Cty. Jail Inmates v. Westlake*, 798 F.2d 1085, 1087 (7th Cir. 1986) ("[T]he Constitution does not give inmates the right to be free from all discomfort[;] [t]he issue with regards to ventilation is the same as with all alleged constitutional violations—does the condition amount to *punishment* of pretrial detainees or *cruel and unusual punishment* of convicted inmates.") (citing *Rhodes v. Chapman*, 452 U.S. 337 (1981); *Bell v. Wolfish*, 441 U.S. 520 (1979)).

As a final point, the Court notes that it has carefully reviewed Plaintiff's response (and his related exhibits) and finds that none of these materials are sufficient to defeat summary judgment on his unconstitutional conditions claim. Plaintiff's citations to two Illinois state statutes that set forth standards of acceptable indoor air quality and ventilation of air (*see* Dkt. 73 at pg. 8) and the informational materials from the EPA concerning indoor air quality and BlueCross BlueShield concerning fresh air and sunlight (*see id.* at pgs. 8-9), are general in nature and have no relation to or bearing upon the Jail's ventilation/maintenance system(s) or the particular facts of this case.

Likewise, Plaintiff also points out in his response that Defendant's reliance

upon the Jail's officer activity logs to show that the windows and vents were cleaned in the various housing units is misleading because those logs are from 2021 – a year after this lawsuit was filed in 2020. (*Id.* at pgs. 7-9.)  Plaintiff is correct that the evidence proffered by the Defendants in this case includes information from 2021 (which was *after* the date Plaintiff filed the lawsuit). But the particular logs to which Plaintiff refers here *also* include information covering 2018 to 2020, and that information shows that vents and windows were cleaned in certain housing units in 2018 and 2019. (Dkt. 68 at ¶¶ 48-54.)  And, with respect to 2020, there is other evidence in the record showing that the Jail was under pandemic protocols from March 2020 to November 2020, which resulted in extended periods of strict lockdowns (during which time the movement of staff, personnel, and inmates was restricted). These restrictions affected the maintenance crew's ability to clean windows in the housing units, although the evidence shows they did go into the housing units and clean up and sanitize windows when they were notified of serious issues (biohazard or other health hazards), for example, cleaning and sanitizing a window when they were informed an inmate had spit on a window. (*Id.* at ¶ 56.)

The Court is sympathetic to Plaintiff's argument that dirty windows at the Jail, particularly during the pandemic lockdown, limited the amount of sunlight that came into his cell and common living areas. But the evidence in the record does not show that the windows were so dirty during the lockdown period as to create unconstitutional conditions of confinement, and the evidence does show that the windows at the Jail in the areas where Plaintiff was confined otherwise were cleaned

Case: 1:20-cv-05959 Document #: 83 Filed: 08/03/23 Page 27 of 30 PageID #:3564

as part of regular maintenance procedures.

To defend against a summary judgment motion, the non-moving party is required to "come forward with specific facts that would support a jury's verdict in [his] favor." *Van Diest Supply Co. v. Shelby County State Bank*, 425 F.3d 437, 439 (7th Cir. 2005). "[A] motion for summary judgment requires the responding party to come forward with the evidence that it has—it is the put up or shut up moment in a lawsuit." *Eberts v. Goderstad*, 569 F.3d 757, 766 (7th Cir. 2009) (internal quotation omitted) (emphasis added). Plaintiff has not done so here. His dissatisfaction with his inability to exercise when, where, and how he would have liked, and under more optimal conditions that he was allowed throughout the time he was detained at the Jail, and his desire for an overall cleaner environment, all of which is understandable coming from someone whose liberty was severely restricted by pretrial detention, coupled with his vague and unsupported contentions/beliefs about the negative impact the complained of conditions had on his health, is simply not enough to support a federal civil rights lawsuit at this stage or to convince the Court that Plaintiff is entitled to make his case to a jury. There are no material disputed facts that must be put before a jury or that could support a verdict in Plaintiff's favor as a matter of law on the record developed in this case.

Finally, even if the conditions of which Plaintiff complains could be characterized as sufficiently serious to fall within the realm of unconstitutional conditions of confinement within applicable Fourteenth Amendment law, which the Court, again, does not find is supported by the facts of record, Plaintiff cannot show

that Defendant, the warden of the Jail at all relevant times, was deliberately indifferent to those conditions. There is no evidence in the record that Defendant knew the windows in dayrooms or indoor recreation areas in any housing unit were so dirty as to impede natural sunlight from streaming into the unit or that Plaintiff or any other detainee or occupant of the Jail had been diagnosed with any serious medical problems because of a lack of access to the outdoors or to sufficient natural sunlight in the housing units. (Dkt. 68 at ¶¶ 73, 74). Plaintiff must show that Defendant was aware of and personally participated in the alleged deprivation of his constitutional rights, and he cannot do so on this record. *Palmer v. Marion County,* 327 F.3d 588, 594 (7th Cir. 2003); *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir. 1983).

At the pleading stage of this case, Plaintiff was allowed to proceed based on allegations of systemic conditions at the Jail that allegedly fell below a constitutional standard even without specific allegations that Defendant had personal knowledge of those conditions. (Dkt. 14 at 4-5.) *See Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002); *Antonelli v. Sheahan*, 81 F.3d 1422, 1428 (7th Cir. 1996). But the evidence developed during discovery and now before the Court in connection with Defendant's motion for summary judgment does not support Plaintiff's allegation of systemic unconstitutional conditions at the Jail. In its initial screening order, the Court specifically advised Plaintiff that "as the case progresses, Ellis must actually *prove* his allegations, rather than enjoy the benefit of the assumption of the truth at this early pleading stage." (Dkt. 14 at pg. 5.) After a thorough review of the record and the

28

appliable law, the Court concludes that Plaintiff has not been able to prove an unconstitutional conditions case or that Defendant was personally involved in the maintenance of the alleged unconstitutional conditions at the Jail either individually or in his supervisory capacity as warden.

Accordingly, for the reasons discussed above, the Court finds that Defendant is entitled to summary judgment on Plaintiff's conditions of confinement claim. Given the disposition of Plaintiff's conditions claim, the Court finds no need to address the remaining arguments in Defendant's motion (concerning injunctive and declaratory relief, and damages).

## III. Conclusion

Accordingly, Defendant's motion for summary judgment is granted, and the case is dismissed with prejudice. Final judgment will be entered. As stated at the outset of this Memorandum Opinion and Order, if Plaintiff wishes to appeal, he must file a notice of appeal with this Court in this case within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1).

Plaintiff need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if Plaintiff wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv).

29

Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated:   August 3, 2023